Good afternoon, Your Honors. My name is Matt Campbell from the Federal Defenders of Eastern Washington and Idaho, and I represent Mr. Frank Murinko, and I'm going to try to reserve three minutes for rebuttal. In this case, law enforcement agents carefully and cunningly followed much of the letter of the law, while repeatedly violating the law's overarching spirit and purpose. The end result is a conviction with the appearance of due process, but lacking in the fundamental fairness the Bill of Rights was designed to guarantee. I think perhaps the clearest example in the several arguments is found in the length of the seizure of the computer. The computer was never objected to by Mr. Murinko. Did he ever demand a computer or ask for the computer back? Well, Your Honor, that's an interesting question, and it's one that Judge Quackenbush discussed some in his order. On March 13th of 07, the consent form was signed. Nevertheless, the agents did not read him his rights, nor did they explain to him that he really had an option not to consent. They simply, and I actually wrote down the agent's testimony, which they told him, and I quote, we need to take the computer to have it analyzed, and would you consent to us taking it so we could have it analyzed? And that's at excerpts 306. Our position is that, and they took it. He didn't object to it, and they took it. He didn't object to it as such. What he did ask before the agents left was, he said, I have personal information on there. I want to get my personal information. The agents told him no. He couldn't do that. Now I would concede that that's not an explicit give me my computer back. However, at the very least, it's an expression that he wants to exercise control over the computer, at least so far as to get it back. They told him that he could not, that he could not get the materials off the computers. He subsequently phoned them after the computer had been seized and again asked, mentioning that he has these items, and they say, no, you know, the computer can't be accessed. At that time, did they have a search? The evidence was slightly murky on that exact point. Mr. Marenko had testified that he had, that he called them, I believe, on March 31st, if memory serves me. The warrant was not obtained until May 24th. There was, the agents were unclear as to exactly when and how many times he called. They didn't keep records of it. They confirmed that he had at least called them a week after the warrant had been obtained on May 31st. But our position is that having asked to get materials off the computer, having asked to at least exercise that much control, having been told, no, you can't even get anything off it, that effectively told him he also couldn't revoke consent. Because obviously the accurate answer would have been, yes, you can get your stuff off it. In fact, you can revoke the consent you just gave. And they never gave that answer. They led him... Is there a case law establishing that? It sounds right, but is there a case law establishing that? Your Honor, I don't have a specific case under these circumstances that would say that exact point. But the cases do indicate that you can revoke. If you can revoke and you're told, no, you can't even get access to your computer, you can't touch it, it's ours now, then I don't see how it could be anything but. But the fact that they effectively misinformed him of his rights, that he didn't have any access to it. Unless you thought, I suppose, that the original consent was a perpetual consent. Well, and that's another point. We also believe that one of our other arguments, which I hope to address in a moment, is that he never gave voluntary consent in the first place, or at least voluntary and knowing consent. But even if he did, we would argue that waivers of constitutional rights, such as the consent to search, are to be narrowly construed. And this consent was ambiguous at best. What do they have to know to make knowingly consent? Well, I think, number one, they have to know what they're consenting to. And as we discussed in our briefing, that was at issue here. They came in and there were essentially two computers, one of which was the children's computer, which was not hooked up to the Internet, one of which was his computer, which he used for the business that he ran, a home business, and that sort of thing. That one was hooked up to the Internet. They asked him some questions and ultimately they do an image, what they call an image scan, of the kid's computer, where essentially they hook up some sort of device to it, scan to see if there's any prohibited images. It came back negative. That's all they ever did with that computer. They asked him, essentially in the consent form it said, to do a full forensic review. They never told him what a full forensic review was. They never told him how long it would take. They never discussed the difference between a full forensic review and an image scan. So one of our points is, even if it was voluntary, he didn't know what he was consenting to. So at the very least, we shouldn't assume that the consent is unlimited in scope, that it says Are there any protocols or standards of procedure with regard to how long the government takes to do these searches or whether they have some obligation to do them relatively quickly? I know that this sort of thing happens a lot, that they take computers and just don't get to them. It's not that they're, and people are deprived of these computers for a very long time, even if there's nothing on them. Your Honor, there is, in this case, there was some testimony about exactly what occurred. It had to go back to a unit. The search unit was, I believe, in Seattle. So our position is not necessarily that they had to search it that day. We're not going to make that argument. However, this type of issue has been addressed in the Doss case in this circuit that we discussed and as well in the Mitchell case out of the 11th Circuit that we discussed, in which the delays in Doss were, that was not a computer case, but it was 7 to 23 days, and Mitchell, which was a computer case, was a 21-day delay. And what the courts essentially said was, and in Mitchell what they were addressing, was the delay in getting a warrant. And that's essentially what we're saying here. If they had gone the day after they took this computer and gone before a judge and presented the circumstances and gotten a warrant, and then they could have either executed the warrant by opening up, copying the hard drive, or done the search, we wouldn't have an issue. But here we're left with a situation where they simply sat on it for two months before getting a warrant for no good reason. They admitted quite candidly, the agents did, that there was nothing in particular. They simply didn't get around to applying for a warrant. They didn't need a warrant, theoretically. Well, our position is that actually they did. If they did, then they shouldn't have taken it at all. How would you articulate a position that said that the original taking of it was okay, but they needed a warrant after that? Is that your position? No. Our position is that it shouldn't have been taken in the first place. All right, all right. But it could have been taken in the first place. That they had an obligation to either search it within a reasonable amount of time or at least obtain a warrant within a reasonable amount of time. And the Mitchell case speaks to the fact that the deprivation of property without a probable cause determination is Fourth Amendment violative to the extent that, A, it interferes with somebody's property interest, and, B, it doesn't deter police misconduct. They don't know what's on that computer until they actually search it. You told them, actually, didn't you? I'm sorry? Did you tell them? He did make some admissions, as did the defendant in Mitchell. And what the Court said is, yes, you have those admissions, but you really don't know what's on that computer until you look at it, and there's an obligation under these circumstances. Thank you. Thank you. Good afternoon, Your Honors. May it please the Court and counsel, my name is John Drake, and I'm a law clerk with the United States Attorney's Office for the Eastern District of Washington. I am also a law student, third-year law student, at Gonzaga University School of Law in Spokane, Washington. Seated with me at counsel table is Ms. Stephanie Lister. Ms. Lister is an Assistant United States Attorney, also in the Eastern District of Washington based in Spokane. Before I begin, I'd like to thank the Court for the opportunity to appear as a law student. I trust that the Court will hold me to the same high standards to which it has held opposing counsel and other counsel this morning. Counsel, he will fulfill them as well. Why isn't the delay in getting a warrant enough to create a problem for you? Well, respectfully, Your Honor, it is not a problem because no warrant was required to perform a consensual search. That has been established law for... He hadn't established you could keep it forever, had he? No, Your Honor, and the government concedes that a perpetual seizure is never appropriate. All right, so then you're left to what was a reasonable time, and two months is an awfully long time. Well, Your Honor, it's not optimal. However, it is not unreasonable. Well, why not unreasonable? I would draw a distinction between a delay in which a warrant is required and a delay in which a warrant is not required. In this case, a warrant is simply not required. It was, in fact, obtained as a matter of FBI protocol, and... How would you draw the distinction? Or could I just come up with some number of months or what? Well, Your Honor, I think that the only true way to determine reasonableness is to perform a totality of the circumstances analysis, and I think that that particular analysis in the consensual search context should, you know, incorporate the following components. First and foremost, prejudice to the defendant as a result of the delay. The presence or absence of bad faith conduct on the part of the investigating agent. Well, it's not bad faith. It's just non-it's inefficient, vast inefficiency. Let's assume it's not bad faith. It's just that they're not in any hurry to do this because no one's made them be in any hurry to do this, and the fact is that people, many people, are quite dependent on their computers, and not having them is a large detriment to their lives. Yes, Your Honor, I agree. People don't get newspapers anymore. You know, just for every daily life thing they do, they need their computer. And a lot of people do business on it and other things, but just for daily life. I agree, Your Honor, and the Eleventh Circuit recognized that in the Mitchell case. However, I would draw a distinction again between a consensual search and a search for which a warrant is required. Respectfully. Well, you were perfectly in the clear when you got the consent, assuming it wasn't for worse. Would six months have been too long? Again, Your Honor, I would submit that that would fall in the not optimal but not unreasonable category. Really? Well, that's interesting. Yes, Your Honor, and again, the point that I'm trying to. . . Nine months? Again, I would hesitate to draw a bright line because. . . I would draw a dark line. Do you have any idea if there are guidelines put out by the FBI or by the Justice Department or anybody on this question? I mean, it's one that's risen to the fore quite a few times now, and people do care about it. Is there anybody for the government who's trying to see that people's computers are not kept because the government's being inefficient at just not getting to them? Your Honor, I am not personally aware of any Department of Justice policy or FBI policy to that effect. However, I would submit that the agent's conduct in this case of actually going to the effort of obtaining a search warrant evidences a very careful. . . What about, I mean, an analogy is a car. What if they come and they take your car, they have probable cause, and instead of searching it and finding out perhaps there's nothing in it, they just let it sit there for six months because they haven't done anything about it. They just haven't gotten to it. So for six months you don't have your car. Yes, Your Honor, and I think that that analogy is somewhat distinguishable because in the instant case the agents had probable cause to believe that there was contraband. . . I'm assuming a probable cause taking of a car, but I'm also assuming that it doesn't take all that long to search a car, and that's one difference. But they just don't do it. They just, and in fact there's nothing there, and in fact once they look at the car they do have to return it, but they just never get around to it. Yes, Your Honor, and I would submit that if a defendant or a suspect rather in your scenario feels that the detention is excessively long, he or she can very easily call the agents and request a return of the property. That is particularly true in the consent context. And you don't think it was a fair reading of what he did here when he said, you know, I have all these pictures, I really want my pictures? No, Your Honor, I do not. And opposing counsel would have this court infer a revocation of consent. However, such an inference is really not warranted. I would draw an analogy to a backpack, which is seized pursuant to an owner's consent, which contains an ounce of cocaine, an illegal firearm, and also an iPod.  Why can't he say, you know, you can't keep my pictures. I at least want my pictures back. That's what he said, in fact. And they said no. Why did they get off saying no at that point? Yes, Your Honor. If I could take my analogy one step further, it would be that in the case of a backpack, a suspect could ask for his iPod back, for example, and it would be very easy for the agents to conduct a search and to take the iPod out and give it back to the suspect. However, when we're talking about a computer hard drive, you cannot physically take items out of it so easily. He had a solution to that. Give me a CD. They said no. They did say no, Your Honor. However, I would note, as Judge Thompson alluded to earlier, that phone call to the agents occurred after they had obtained a search warrant. So even if this Court were to find that, or were to infer that the defendant had revoked his consent at that point, that. But at that point, doesn't some delay consideration, if they're then reliant on the search warrant, then they certainly have an obligation to proceed with some alacrity, don't they? And they did, Your Honor. The search was actually conducted on the same day, March, excuse me, May 24th, on which the magistrate judge granted the search warrant. So the search was very timely conducted once the warrant was obtained. So that's, I mean, it's very interesting because obviously they thought for some reason they needed the warrant. Well, Your Honor, again, and this is reflected in the district court's order, they did so as a matter of department policy. The reason why they require agents to obtain a search warrant, even when consent has been obtained, is because the scope of consent can be challenged, it can be modified, it can be revoked. And none of those occurred in this case. However, they could have. But once a search warrant is obtained, that revocation respectfully becomes irrelevant. Now, I would like to briefly address the defendant's argument with respect to Missouri v. Siebert and the extension of Miranda into the realm of noncustodial interrogations. Now, opposing counsel suggested that the agents in this case deliberately attempted to circumvent the defendant's rights by being his friend, by being very cordial, by not confronting him with evidence of guilt. I would submit that that reflects a high degree of professionalism rather than disregard for the defendant's rights. Now, if we were to accept defendant's proposition that the defendant was in custody, first of all, on March 13, 2007, and December 19, 2007, which the district court found that he was not, that would then require us to, would have required the agents to advise him of his Miranda rights at that time. Now, even if this court were to determine that he was in custody on those two occasions, there is nothing in the record to reflect that the agents acted in a deliberate attempt to circumvent the protections afforded to a defendant in Miranda v. Arizona. And that's critically important. Siebert and this court's opinion in Williams hold that that deliberateness finding is really what triggers the Siebert analysis. If there is no finding of deliberateness on the part of the agents, there can be no violation of Missouri v. Siebert. And in that situation where there is no deliberate violation, the Supreme Court's decision in Oregon v. Elstad would govern. And under those circumstances, a statement is admissible if it was voluntarily made before the warnings were issued and voluntarily made after they were issued. At one point he began to cry, didn't he? Yes, he did, Your Honor. How long into the interrogation was that? Your Honor, I don't think that the record is clear in terms of precisely how long into the interview it occurred. How long did it go on, you know? The interview itself, the first interview. No, he was crying. That was certainly a sign, I would think, that he fell under some constraint. Yes, Your Honor, and I believe that during the last portion of that first interview on March 13, 2007, he was very emotional, and the record reflects that. However, the record also reflects that he did not become highly emotional, in other words, crying until the very last moments when the agents were packing up the defendant's computer. So the point at which he provided consent and signed the consent form, really, that occurred before the emotional breakdown, I guess, for lack of a better word. And the consent that was obtained prior to that breakdown was knowing and voluntary, and the district court so found. He was told several times, wasn't he, that they'd leave if he wanted them to. Yes, Your Honor. The agents exercised an abundance of caution with respect to his rights. They did not provide a formal Miranda warning on either of the first two occasions. However, they did advise him when they arrived at his home that he was not under arrest, he was not in custody, he was free to ask the agents to leave his house at any time, and that he was not under any obligation to sign any statements. And I think that reflects, again, a very professional approach to the investigation, rather than a deliberate attempt to undermine the defendant's rights. Okay. Thank you very much. Thank you. Very nice job. Good argument. Sir. Thank you, Your Honors. Again, just returning to the length of time, it appears that the government's position would amount to, in essence, a perpetual seizure. Two months is neither optimal nor reasonable, and this idea that there could be different limits for a consent search versus a non-consent search doesn't appear in either DOS or … Well, it could be, depending on what the consent is, right? I mean, if they said to him, do you consent to taking our computer and keeping it as long as you want to, then there would be a different standard. Agreed, Your Honor, that if it was explicit, or you can have it for a month and then give it back to me. I would concede that point, but that's clearly not what happened here. What happened here, at best, was the signing of a consent form that was ambiguous, and I would take issue with one statement made by opposing counsel. Arguably, the phone call that the agents testified to occurred after the search warrant, but Mr. Marinko testified clearly, ER 357, that he asked to get his photos before they took the computer from his home and was told no. So the record indicates that this consent issue, or the revocation of consent, he was told he could not revoke that consent at the time that the computer was taken from his home. And to the extent that the government is going to rely on this policy of obtaining warrants in order to deal with this consent issue, they don't appear to be following their own policy if they're telling people, you can't get your photos back. He could get his photos back. He could revoke his consent. He could get his whole computer back. And they seem to be giving out information that contradicts their own policy. And under these circumstances, I would argue that the backpack example that counsel mentioned, this is almost the reverse situation where he's asking for one very particular item, and they're saying, no, you can't even have that one particular item. Well, having told him that he can't have the one particular item, they can't now say, well, he could have taken back the whole thing, but he really didn't know. So that example seems a bit misplaced. And I'd simply ask, before I try the Court's patience too much, that Judge Berzon's points about the importance of a computer, this Court has recently addressed that in U.S. v. Payton, and the language in there was very broad, and it explained exactly how important computers are to people. So we do believe that there is prejudiced interference with a property interest. And we'd ask the Court to consider all arguments in the briefing. Obviously, there wasn't enough time. Thank you very much. Both of you did a lovely job with the interesting case. Thank you. Good argument. So the case of the United States v. Morico is submitted, and we are in recess until tomorrow. All rise.
judges: Noonan, Thompson, Berzon